UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

                                :

DR. GERALD FINKEL, as Chairman of the     :     MEMORANDUM
Joint Industry Board of the Electrical Industry,    :     AND ORDER

                    Plaintiff,         :

                                :     09-CV-01253 (JG) (VVP)

          -against-           :

                                :

LITE TRON LTD., LITE TRON ELECTRICAL    :
CORP., and FERDINAND IANNACONE,      :

                                :

                 Defendants.       :

----------------------------------------------------------------X

A P P E A R A N C E S:

     COHEN, WEISS AND SIMON, LLP
          330 West 42nd Street
          New York, NY 10036
     By:     Elizabeth O'Leary
          Michael Seth Adler
          James Robert Grisi
          *Attorneys for Plaintiff*

     BLEAKLEY PLATT & SCHMIDT, LLP
          One North Lexington Avenue
          7th Floor
          White Plains, New York 10601
     By:     Joseph DeGiuseppe, Jr.
            --&--
     FEERICK LAW OFFICE
          236 West 26th Street
          Suite 303
          New York, New York 10001
          *Attorneys for Defendants*

JOHN GLEESON, United States District Judge:

       Plaintiff Gerald Finkel, as Chairman of the Joint Industry Board of the Electrical

Industry ("JIB"), is an administrator and fiduciary of various employee benefit plans established

and maintained pursuant to collective bargaining agreements ("CBAs") between Local Union

No. 3 of the International Brotherhood of Electrical Workers, AFL-CIO ("Local 3") and various employers and employer associations in the electrical industry. Defendant Lite Tron Ltd. ("Limited") is a New York electrical contracting corporation, which has entered into a series of CBAs with Local 3 in effect since at least May 10, 2007. Defendant Ferdinand "Fred" Iannacone ("Iannacone") is the sole owner and president of Limited. He is also the sole owner and president of defendant Lite Tron Electrical Corporation ("Electrical"), a non-union company.

In this action, Finkel seeks to recover funds allegedly due to JIB in accordance with the terms of the CBAs to which Limited is a party. Finkel alleges that the defendants engaged in a fraudulent scheme to violate the terms of the CBAs by using Electrical, rather than Limited, to perform work covered by the CBAs and thereby defraud JIB out of contractually mandated contributions. Finkel's complaint states three causes of action. The first two are claims against Limited pursuant to sections 502 and 515 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132, 1145, and section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. The third is a claim against Iannacone, alleging that he is jointly and severally liable for any contributions owed by Limited pursuant to ERISA sections 502 and 515.

Iannacone has moved for summary judgment dismissing the claim asserted against him. He argues that Finkel cannot establish a basis for holding him personally liable for Limited's alleged ERISA violations, because the evidence fails to support the elements of a common law fraud claim. He further argues that Finkel's amended complaint does not allege fraud with the particularity required by Fed. R. Civ. P. 9(b). Oral argument on the motion was held on October 29, 2010. For the reasons stated below, Iannacone's motion for summary judgment is denied.

BACKGROUND

A.     *Terms of the Applicable Collective Bargaining Agreements*

       Limited is a member of the Association of Electrical Contractors, Inc. ("AEC") and has agreed to be bound to the terms of CBAs entered into by AEC and Local 3. (Def. Iannacone's 56.1 Stmt., Sept. 24, 2010, ECF No. 40 ("Def.'s 56.1 Stmt.") ¶¶ 19-20, 22.) These include a 2007 CBA effective from May 10, 2007 through May 13, 2010 and a 2010 CBA effective from May 14, 2010. (*Id.* ¶ 22; Am. Compl., July 19, 2010, ECF No. 31 ("Am. Compl.") ¶¶ 15-16.) Pursuant to these CBAs, Limited is required to remit certain contributions to a number of employee benefit plans within the meaning of Sections 3(3) and 3(37) of ERISA, 29 U.S.C. §§ 1002(3), 1002(37).[1] (Am. Compl. ¶ 18, 5.) JIB is the administrator and fiduciary of these plans within the meaning of Sections 3(16)(A)(i) and 3(21)(A) of ERISA, 29 U.S.C. §§1002(16)(A)(i), 1002(21)(A), and is therefore a third-party beneficiary of the CBAs. (Am. Compl. ¶ 5; Def.'s 56.1 Stmt. ¶ 16.; Pl.'s 56.1 Stmt. ¶ 18.)

       Contributions to the ERISA plans are to be made according to rates set out in the CBAs and are based on the number of hours worked by employees performing covered work as defined in the CBAs. (*Id.* ¶ 18; Pl.'s 56.1 Stmt., Oct. 15, 2010, ECF No. 49 ("Pl.'s 56.1 Stmt.") ¶¶ 26-50.) Pursuant to the 2007 CBA, covered work includes the assembly, construction, and installation of electrical equipment, appliances, and apparatuses.[2] (Decl. Opp. Mot. Summary

---

[1]     Limited is also contractually obligated to make contributions to certain plans that do not qualify as employee welfare plans under ERISA. (Am. Compl. ¶¶ 6-7.) As Finkel seeks to hold Iannacone liable only for contributions due pursuant to Section 515 of ERISA, (Am. Compl. ¶ 67), only the ERISA-qualified plans are relevant for purposes of the present motion.

[2]     Specifically, pursuant to the 2007 CBA, Local 3's jurisdiction includes:

     (i) The manufacture, assembling, construction, installation or erection, repair or maintenance of all materials, equipment, apparatus and appliances required in the production of electricity and its effects. . . .

3

Judgment by Christina Sessa, Oct. 15, 2010, ECF No. 46 ("Sessa Decl."), Ex. A at 5 (2007 CBA,

Article I, Section 2(c)).)  In addition, the CBA provides:

> If and when [Limited] shall perform any on-site construction work of the type covered by this Agreement, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity including a joint venture, wherein [Limited], through its officers, directors, partners or stockholders, exercises either directly or indirectly, management control or majority ownership, the terms and conditions of this Agreement shall be applicable to all such work.

(Sessa Decl., Ex. A at 23-24 ("2007 CBA, Art. III, Rule 2(g)(1)").)

In addition to remitting contributions, Limited is required to submit weekly

payroll reports to JIB that set out the amount of contributions due as well as the names of,

standard gross wages earned by, and hours worked by employees performing covered work.

(Sessa Decl. ¶¶ 7, 16.)  JIB relies on these reports to determine participants' entitlement to

benefits under the terms of the various plans and to ensure that the proper amounts of

contributions are paid to each plan. (*Id*. ¶¶ 16, 19.)  JIB assesses interest on any late

contributions, and the 2007 CBA provides for liquidated damages in the amount of twenty

percent of any delinquent ERISA plan contributions.  (Pl.'s 56.1 Stmt. ¶¶ 58, 62.)

B.    *Relationship Among the Defendants*

Electrical and Limited are both New York corporations.  (Def.'s 56.1 Stmt. ¶¶ 1,

2.)  Electrical was incorporated in 1977; Limited was incorporated eleven years later.  (*Id.*)

---

(iii)The operation, inspection and supervision of all electrical equipment, apparatus, appliances, or devices  by which the energy known as electricity is generated, utilized and controlled.

(iv) The manufacture, assembling, construction, installation, erection, repair or maintenance of all materials, equipment, apparatus and appliances required in the transmission of data, voice, sound, video and other emerging technologies (including fiber optics, high speed data cable, etc.).

(Sessa Decl., Ex. A at 5 (2007 CBA, Article I, Section 2(c)).)

Electrical is a contracting company that performs demolition, molding, plastering, and painting. (Pl.'s 56.1 Stmt. ¶ 92)   Electrical is a non-union company and has never been a signatory to any union contract.  (Def.'s 56.1 Stmt. ¶ 25.)  Prior to the events that gave rise to this action, Electrical was not performing any electrical work, such as the installation of lighting fixtures, outlets, switches, and fire alarm systems.  (Decl. Opp. Mot. Summary Judgment by James R. Grisi, Ex. A, Oct. 15, 2010, ECF. No. 45 ("Iannacone Apr. Dep.") at 27-28, 34; Def.'s 56.1 Stmt. ¶ 93.)

According to Iannacone, Electrical engages Limited as a subcontractor to perform electrical work.  (Def.'s 56.1 Stmt. ¶ 7.)  Finkel disputes this characterization of the companies' relationship.  (Pl.'s Counterstmt. To Def.'s 56.1 Stmt, Oct. 15, 2010, ECF No. 47 (("Pl.'s 56.1 Counterstmt.") ¶ 7.)  At a deposition, Iannacone testified that "work is basically signed through Lite Tron Electrical, and Lite Tron Limited performs all the work."  (Iannacone Apr. Dep. at 18.)  However, there is no written agreement governing the relationship between the parties, either generally or with respect to individual projects.  (*Id*. at 77-78.)  Limited is not licensed by the City of New York to perform electrical work; it uses Iannacone's license, which is registered in the name of Electrical.  (Def.'s 56.1 Stmt. ¶¶ 9-10, 14; Pl.'s 56.1 Counterstmt. ¶¶ 9-10.)  General contractors and others who deal with the companies do not distinguish between them, and many do not even realize there are two companies.  (Iannacone Apr. Dep. at 18.)  Invoices, as well as purchase orders and proposals, are sometimes sent on Electrical letterhead and sometimes on Limited letterhead, regardless of which company's employees perform the work. (*Id*. at 85-86, 89-91; Decl. Opp. Mot. Summary Judgment by James R. Grisi, Ex. C, Oct. 15, 2010, ECF. No. 45 ("Perez Dep.") at 115-116, 119-120.)  General contractors are invoiced for the total cost of services provided by the two companies; costs of material and labor are not itemized.

(Iannacone Apr. Dep. at 80-81.)  Since 2005, on the advice of an accountant, Limited prepares

typed invoices to Electrical for the cost of labor, and Electrical then makes payments to Limited,

which in turn pays its employees.  (*Id.*)  Limited keeps no other funds in its account.  (*Id*. at 101.)

Electrical and Limited share a common office space.  (Def.'s 56.1 Stmt. ¶ 4, 6.)

No written agreement allocates the use or costs of this space, but Electrical pays all rent and

utility bills.  (Iannacone Apr. Dep. at 30-31.)  Electrical has no office employees.  (*Id*. at 26.)

Electrical used to employ office assistant Debbie Perez, who performs office functions on behalf

of both companies, but in 2002 she joined a union and was transferred to Limited's payroll.  (*Id*.

at 26-27.)  Neither company owns much property – Electrical owns a truck, which has Limited's

name on it, while Limited owns some hand tools, which say "Lite Tron" on them.  (*Id.* at 18-19.)

No written agreement governs either company's use of the other's property.  (*Id*. at 19.)

Both Electrical and Limited are wholly owned by Iannacone, who is president and

sole shareholder of each company.  (Def.'s 56.1 Stmt. ¶¶ 3, 5.)  While Iannacone's wife,

Christine, is sometimes listed as the secretary of Limited – because "in certain circumstances you

need a secretary that is supposed to be on board and I put my wife's name down" – she has no

formal role in the company and knows nothing about its affairs or operations.  (Iannacone Apr.

Dep. at 11.)  On at least one occasion, Iannacone transferred $100,000 in personal funds to

Electrical to ensure that its payroll was met.  (Pl.'s 56.1 Stmt. ¶ 252.)  It is unclear from the

record whether this transfer constituted a formal loan or investment, or was memorialized by any

written agreement between Iannacone and Electrical.  The record suggests that this transfer was

not a unique occurrence.  (Decl. Opp. Mot. Summary Judgment by James R. Grisi, Ex. N, Oct.

15, 2010, ECF. No. 45 ("Lasalle Memo") ("[Iannacone] has not established a traditional bank

line for the company as Fred has personally put funds into the company when needed and opted

to utilize a home equity line for cost reasons.  At our meeting, it was discussed that if he is going

to require bonds going forward, he will need to continue to build equity of the company and

obtain a traditional bank line to supplement the corporate needs.").)[3]  On multiple occasions,

Electrical employees have performed work for members of Iannacone's family. (Perez Dep. at

83-86.)  The record does not reflect whether Electrical was compensated for these services.

C.      *The 80 Metropolitan Project*

Hudson Meridian Construction Group is a construction manager and general

contractor for construction projects in New York City, including a project located at 80

Metropolitan Avenue, Brooklyn ("80 Metropolitan").  (Def.'s 56.1 Stmt. ¶ 31-32.)  Hudson

Meridian is a non-union firm, but it hires union contractors to work on its job sites if their

proposals are competitive with those of non-union contractors.  (Decl. Opp. Mot. Summary

Judgment by James R. Grisi, Ex. E, Oct. 15, 2010, ECF. No. 45 ("Caliccio Dep.") at 37; 14-15.)

For the 80 Metropolitan project, Hudson Meridian wanted a non-union, bondable electrical

contractor.  (Def.'s 56.1 Stmt. ¶ 37.)

Between April and June 2007, Electrical made a bid to do the electrical work for

80 Metropolitan.  (*Id.* ¶ 42.)  At the time, Iannacone was in Naples, Florida for health-related

reasons.  (*Id.* ¶ 12.)  During the bidding process, Iannacone's son, Christopher Iannacone

("Christopher"), served as Electrical's representative in discussions with Steven Calicchio, a

project executive for Hudson Meridian.  (*Id.* ¶¶ 26, 41, 35.)  Christopher, who holds an electrical

---

[3]      In a memo prepared in November 2007 to advise a bonding company whether to approve a bond application by Electrical, Irma Lasalle of International Fidelity Insurance Company wrote with respect to the company: "While the balance sheet is not what we'd traditional[ly] need to see to support an account at these levels of surety, I believe off balance sheet and the personal wealth does attribute to the accomplishments of Fred Iannacone over the last 30 years." (Lasalle Memo.)  She further noted that a "personal statement prepared for Fred and Christine Iannacone as of 3/31/07 is showing $347M in cash, $330M in marketable securities and approximately $8.6 million of real estate holdings with no debt associated aside from the home equity line of credit.  The real estate holding include 2 commercial condo units in NYC, 3 residential properties in Brooklyn and 2 properties located in Florida (Naples & Tampa) and personal residence in Staten Island, NY."  (*Id.*)

license in the State of New Jersey but not in New York City, has been employed by Electrical in various capacities since 2002 and became its full-time employee in 2005. (*Id.* ¶¶ 28-30.) During negotiations, Christopher held himself out as Electrical's owner. (Pl.'s 56.1 Stmt. ¶ 225.) He assured Calicchio that Electrical would use a nonunion workforce at 80 Metropolitan, (*id.* ¶ 220), and, when Hudson Meridian decided to award Electrical the contract because it was the lowest bidder, (*id.* ¶ 223), Christopher signed the contract on behalf of Electrical, even though he did not have the authority to do so, (Iannacone Apr. Dep. at 58).

The parties dispute the extent to which Iannacone was aware of or involved with Electrical's bid for the 80 Metropolitan contract. (Pl.'s 56.1 Counterstmt. ¶ 43.) While he was away on a medical leave of absence, Iannacone had access to his emails, which he checked regularly, and he made calls into the business at least once a week. (Pl.'s 56.1 Stmt. ¶¶ 200-202.) He reviewed drawings, prepared estimates and proposals, and reviewed bids. (*Id.* ¶¶ 203-05.) Nonetheless, Iannacone testified at a deposition that he was completely unaware of Christopher's activities on behalf of Electrical with respect to 80 Metropolitan until November 2007, after the contract had already been awarded. (Iannacone Apr. Dep. at 56-57, 117.) The record reveals that Iannacone became involved no later than November 21, 2007 in efforts to secure a bond for Electrical's work at 80 Metropolitan. (Decl. Opp. Mot. Summary Judgment by James R. Grisi, Exs. N-O, Oct. 15, 2010.) Iannacone signed a performance bond on behalf of Electrical for the project on or about December 5, 2007. (Def.'s 56.1 Stmt. ¶ 47.)

Iannacone testified that he believed his son had underbid the job and that he wondered whether he would be able to make a profit on the contract. He also recognized that his son had no authority to sign the contract with Hudson Meridian on behalf of Electrical. (Iannacone Apr. Dep. at 57-58.) Iannacone further testified that, when he first learned about the

Hudson Meridian contract, he assumed that it was a union job, because it involved electrical work and "I'm a union contractor," but he soon realized that in submitting the bid, Christopher had priced the labor at a non-union class of pay. (*Id.* at 57-58.) Iannacone did not consider paying the employees union wages. (*Id.* at 62 ("I couldn't even to help him out to say that let's turn this job union versus that he had signed it non-union because what he included in this job for wages, union wages is twice the thing, there is no way I could justify to do anything.").) Nor, according to Iannacone, did he make any effort to terminate the contract, in part because Christopher was afraid of embarrassing the general contractor. (*Id.* at 59-60, 62 ("[B]y the time I got back the contract was signed, the agreement was made, he was already working doing digging on the job preparing for the work to start and so it[']s my son, what am I going to do?"); Pl.'s 56.1 Stmt. ¶ 229-31.)

Instead, Iannacone and Christopher decided to use Electrical rather than Limited to perform the contract, because Electrical was not a signatory to any union agreement. (Iannacone Apr. Dep. at 59.) Christopher interviewed and hired all of the Electrical employees who worked at 80 Metropolitan; no Limited employees worked on the project. (Def.'s 56.1 Stmt. ¶¶ 48, 50.) Iannacone alleges that he told Christopher he would have to perform the contract on his own, that Iannacone would not touch the paperwork, the billings, the records, or the payroll. (*Id.* at 60.) However, Iannacone admitted that the work was performed by his company, Electrical, using his electrical license. (*Id.* at 61.) Iannacone also admitted to covering for Christopher in certain respects when Christopher went on vacation, and Iannacone personally performed work at 80 Metropolitan on some occasions. (*Id.* at 54-56; Decl. Opp. Mot. Summary Judgment by James R. Grisi, Ex. B, Oct. 15, 2010, ECF. No. 45 ("Iannacone Aug. Dep.") at 88-89.)

According to Iannacone's testimony, Electrical began in 2007 to keep a second general ledger. (Iannacone Apr. Dep. at 111-12.) The first was used for Electrical's daily operations, and the second was used to account for the 80 Metropolitan job. (*Id*.) In addition, Iannacone submitted payments related to the 80 Metropolitan project into a bank account separate from the account in which he deposited Electrical's other receivables. (Pl.'s 56.1 Stmt. ¶ 247; Iannacone Aug. Dep. at 18.)

D.       *The Allegedly Fraudulent Scheme*

From October 2007 to November 2009, Electrical's employees performed electrical services and other work on the 80 Metropolitan project. (Def.'s 56.1 Stmt. ¶ 52.) An audit report prepared by JIB reveals that Electrical's employees earned at least $919,601.04 in contractual wages performing electrical work as defined by the 2007 CBA. (Am. Comp. ¶ 45.) Finkel has alleged that this work was covered work within the terms of the CBA, (Pl.'s 56.1 Stmt. ¶ 289), but that Electrical paid the employees below union scale, and that Limited failed to report wages earned for their covered services and failed to remit contributions due under the CBA in relation to this work. (Am. Compl. ¶¶ 45-48, 55.)

During the same time period, Electrical employees performed electrical work on a project at Chelsea Piers. (Pl.'s 56.1 Counterstmt. ¶ 52; Pl.'s 56.1 Stmt. ¶¶ 465-471.) Iannacone had been asked by a representative of Chelsea Piers to quote a price for the work based on non-union wages. (Iannacone Apr. Dep. at 34-35; Iannacone Aug. Dep. at 56-59.) Iannacone stated that Limited could not perform the work with non-union labor, but referred the representative to his son. (*Id*.) Electrical employees performed electrical work at Chelsea Piers and were supervised by Christopher, but Iannacone assisted his son because Christopher did not know how to perform the work. (*Id*.)

Finkel alleges that the arrangement by which Electrical employees performed covered work, and Limited did not account for this work in its reports and contributions, constituted a scheme to defraud JIB by underreporting hours and underpaying contributions. (*Id.* ¶ 56.) Finkel further alleges that Iannacone knowingly participated in this allegedly fraudulent scheme. (*Id.* ¶ 55-56.) Iannacone moves under Fed. R. Civ. P. 56 for an order dismissing the claim against him. He argues that Finkel's allegations of fraud are pled with insufficient specificity under Fed. R. Civ. P. 9(b), and that, as a matter of law, Finkel cannot prevail on a claim of fraud.

## DISCUSSION

A.      *Legal Standard for Rule 56 Motion for Summary Judgment*

A motion for summary judgment should be granted only if the pleadings and documentary evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010). "A fact is material if it might affect the outcome of the suit under the governing law." *Id.* When applying this standard, the court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *See Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001).

B.      *Individual Liability for ERISA Obligations*

1.      *Legal Standard*

Generally, "an individual is not liable for corporate ERISA obligations solely by virtue of his role as officer, shareholder, or manager." *Sasso v. Cervoni*, 985 F.2d 49, 50 (2d Cir.

1993). However, the Second Circuit has "recognized that special circumstances . . . might warrant the imposition of personal liability for a corporation's ERISA obligations." *Id.* In order to determine whether such "special circumstances" exist, district courts are to "examine the officer's actual role in the company's affairs and relationship to the company's wrongdoing." *Cement and Concrete Workers District Council Welfare Fund, Pension Fund, Legal Services Fund and Annuity Fund v. Lollo*, 35 F.3d 29, 33 (2d Cir. 1994) (citing *Leddy v. Standard Drywall, Inc.*, 875 F.2d 383, 387 (2d Cir. 1989)). The Second Circuit has held that a corporate official who "deliberately flout[s] ERISA obligations [does] not deserve the protection of the corporate form." *Lollo*, 35 F.3d at 33 (citing *Leddy*, 875 F.2d at 388).

For instance, where "a controlling corporate official defrauds or conspires to defraud a benefit fund of required contributions, the official is individually liable under Section 502 of ERISA, 29 U.S.C. § 1132." *Leddy*, 875 F.2d at 388. The Second Circuit has prescribed a two-step process for determining whether a corporate official's fraudulent conduct renders him liable for the corporation's ERISA violations. First, the court must determine whether the individual is a "controlling corporate official." *Lollo*, 35 F.3d at 33. Second, the court must determine whether the official's conduct rises to the level of common law fraud. *Id.* "In order to prove a fraud claim, [a plaintiff] must demonstrate '1) a material false representation or omission of an existing fact, 2) made with knowledge of its falsity, 3) with an intent to defraud, and 4) reasonable reliance, 5) that damages plaintiff.'" *Id.* (quoting *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 276 (2d Cir. 1992) (alteration omitted)).

Where both control and fraudulent conduct are established, an individual officer is liable for a corporation's ERISA violations "even if the traditional conditions for piercing the corporate veil are not met." *Leddy*, 875 F.2d at 388. In determining whether to impose

individual liability under ERISA, the Second Circuit has considered the Supreme Court's "'consistent[] refus[al] to give effect to the corporate form where it is interposed to defeat legislative policies.'" *Lowen v. Tower Asset Management, Inc.*, 829 F.2d 1209, 1220 (2d Cir. 1987) (quoting *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 630 (1983). Accordingly, courts in this Circuit "have without difficulty disregarded form for substance where ERISA's effectiveness would otherwise be undermined." *Lowen*, 829 F.2d at 1221. In the absence of a robust corporate identity, where an owner or shareholder invokes the corporate form in order to avoid the obligations imposed by ERISA, "'a failure to disregard the corporate form . . . would fatally undermine ERISA.'" *Id.* (quoting *Alman v. Danin*, 801 F.2d 1, 4 (1st Cir. 1986) ("Allowing the shareholders of a marginal corporation to invoke the corporate shield in circumstances where it is inequitable for them to do so and thereby avoid financial obligations to employee benefit plans, would seem to be precisely the type of conduct Congress wanted to prevent.")).

2.      *Evidence of Common Law Fraud*

Iannacone concedes that he is a "controlling corporate official," (Def.'s Reply Mem. Support Summary Judgment at 2, Oct. 22, 2010, ECF No. 52), and the evidence establishes that Iannacone ran the daily operations of both Limited and Electrical and was ultimately responsible for payroll, bookkeeping, preparing and submitting bids, and submitting the required contributions and payroll reports to JIB. The record further supports the conclusion that Iannacone was ultimately responsible for the decisions to use Electric, rather than Limited, to complete the 80 Metropolitan project and not to submit contributions based on that work or report to JIB the hours spent by Electric's employees on the project.

However, Iannacone denies that Finkel can prove the elements of fraud. He contends that the evidence shows as a matter of law that his actions did not constitute a fraudulent scheme to avoid his company's obligations under ERISA. However, a reasonable fact finder considering the evidence before the Court could conclude that Iannacone intentionally and knowingly made misrepresentations of material fact to JIB, and that JIB relied on these misrepresentations to its own detriment.

a.      *The False Representation or Omission*

To prove its allegations of fraud, Finkel must first show that Iannacone made or conspired to make a false representation or omission of an existing fact. Employees of Electrical performed electrical work as defined in the 2007 CBA, yet Iannacone remitted no contributions based on this work and failed to include this work in the payroll reports he submitted to JIB. Electrical is not a signatory to the 2007 CBA, but sufficient evidence exists to support a conclusion that Iannacone was nonetheless required to account for electrical work performed by Electrical's employees because Electrical was an alter ego of Limited.

"'The hallmarks of alter ego doctrine include whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership.'" *Brown v. Sandimo Materials*, 250 F.3d 120, 128 n.3 (2d Cir. 2001) (quoting *Truck Drivers Local Union No. 807 v. Regional Import & Export Trucking*, 944 F.2d 1037, 1046 (2d Cir. 1991) (internal quotation marks omitted)). "The focus of the alter ego doctrine . . . is on 'the existence of a disguised continuance or an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or technical change in operations.'" *Lihli Fashions Corp. v. N.L.R.B.*, 80 F.3d 743, 748 (quoting *Truck Drivers*, 944 F.2d at 1046 (internal quotation marks omitted)). Second Circuit law strongly suggests that the

14

alter ego inquiry in this context is more flexible than that under traditional state law alter ego

doctrine. As observed by the Second Circuit in *Leddy*, "'[t]he Supreme Court has consistently

refused to give effect to the corporate form where it is interposed to defeat legislative policies.

In determining whether to disregard the corporate form, we must consider the importance of the

use of that form in the federal statutory scheme, an inquiry that generally gives less deference to

the corporate form than does the strict *alter ego* doctrine of state law." 875 F.2d at 837 (quoting

*Lowen*, 829 F.2d at 1220).

      The evidence clearly supports the conclusion that Electrical and Limited reflect

the "hallmarks" of alter ego companies. In addition, Iannacone has testified that, prior to the 80

Metropolitan job, Electrical was not engaging in electrical work, but used Limited employees to

do such work. Iannacone testified that he agreed to use Electrical to perform the electrical work

under the 80 Metropolitan contract because Electrical was not a signatory to any union contract,

and Christopher had represented to an 80 Metropolitan representative that he would use non-

union labor and had used non-union wage rates to calculate his bid price. Based on this

evidence, a reasonable fact finder could conclude that Iannacone's decision to use of Electrical

rather than Limited to perform the electrical work on the 80 Metropolitan project constituted a

"sham transaction or technical change in operations" for the purposes of avoiding Limited's

obligations under the applicable CBAs.[4]

      If the evidence is viewed in the light most favorable to Finkel, Limited, in

remitting contributions and preparing payroll reports, was obliged by the terms of the CBA to

---

[4]    An arrangement by which "one union company conceals financial activity through a nominee non-union company" is known as "double-breasting." *N.Y. Dist. Council of Carpenters Pension Fund v. Perimeter Interiors, Inc.*, No. 06 CV 6377 (WHP), 2009 WL 362640, at *2 (S.D.N.Y. Feb. 13, 2009). While "[t]he formation of a double-breated operation is not a *per se* violation of ERISA or the LMRA, [it] may serve as the basis for an allegation that the operation is in fact a single employer or alter ego employer." *Fuchs v. Cristal Concrete Corp.*, 2006 U.S. Dist. LEXIS 48767, at *27 (E.D.N.Y. 2006).

account for the hours of electrical work performed by its alter ego's employees on the 80 Metropolitan project.[5] Assuming Limited was bound by such an obligation, Iannacone's failure to account for those hours on Limited's payroll reports constituted omissions of fact and rendered statements on those reports false representations.

b. *Knowledge and Intent*

Finkel has alleged that Iannacone "knowingly participat[ed] in a scheme to underreport and underpay contributions to [JIB]." (Am. Compl. ¶ 56.) It is undisputed that Iannacone knowingly failed to account for the electrical work done at 80 Metropolitan in both his contributions and his payroll reports, but Iannacone argues that this failure did not reflect an intent to defraud JIB. Iannacone testified that because Electrical was a non-union company, he believed that the CBA imposed no obligations with respect to work performed by Electrical's employees. (Iannacone Aug. Dep. at 31-32 ("I didn't feel that because Lite Tron Ltd. was always a subcontractor to Electrical and Electrical didn't have a bargaining agreement, that I wasn't doing anything wrong.").) A fact-finder who believes Iannacone's testimony might determine that Iannacone acted without any fraudulent intent, but other evidence calls his testimony into doubt and provides ample basis to conclude that Iannacone acted with an intent to defraud JIB. For instance, Iannacone did not use Electrical's bank account or general ledger for business related to 80 Metropolitan, and instead kept a second set of books and maintained a second bank account for that project. Iannacone also testified that when Local 3 asked to conduct an audit of his companies' books, he allowed them to review Limited's records, but not

---

[5]     The terms of the 2007 CBA explicitly require a signatory company to account for any covered work performed by the employees of an alter ego company. Article III, Rule 2(g)(1) provides: "If and when [Limited] shall perform any on-site construction work of the type covered by this Agreement, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity including a joint venture, wherein [Limited], through its officers, directors, partners or stockholders, exercises either directly or indirectly, management control or majority ownership, the terms and conditions of this Agreement shall be applicable to all such work."

Electrical's. (Iannacone Apr. Dep. at 33.) Iannacone explained that he viewed Electrical's books as "personal information" to which Local 3 was not entitled. These facts support an inference that Iannacone knew he was acting in violation of the CBA's terms and intentionally tried to conceal the violation from JIB.

      c.    *Reasonable Reliance*

JIB has alleged that it relied on the representations made by Iannacone in his payroll reports to calculate the ERISA-plan participants' entitlement to benefits, and to ensure that the proper amounts of contributions were paid to each plan. Iannacone contends that the evidence precludes a finding that JIB reasonably relied on any misrepresentations or omissions by Iannacone. In particular, Iannacone points to evidence that Local 3 representatives were seen on the 80 Metropolitan site in early 2008, (Def.'s 56.1 Stmt. ¶¶ 53-59), and that Local 3 received notice in mid-August 2008 of unfair labor practices charges filed with the NLRB by employees of Electrical working on the 80 Metropolitan project, (*id.* ¶¶ 72-77.) Yet, the argument continues, it was not until November 2008 that JIB sent a letter to Iannacone claiming that Electrical "may be doing work in the jurisdiction of Local Union #3," and demanding an audit of Electrical's books. (*Id.* ¶¶ 78-79.) Because Local 3 must have been aware in early 2008 that Electrical employees were performing electrical work at the site, Iannacone concludes, JIB, in turn, could not have reasonably relied upon any reports thereafter filed by Iannacone that failed to account for this work.

The evidence cited by Iannacone does not preclude a finding of reasonable reliance as a matter of law. First, the deposition testimony respecting the alleged visits by Local 3 representatives to the 80 Metropolitan site is both vague and unsubstantiated by documentary evidence. (Pl.'s 56.1 Counterstmt. ¶¶ 53-59.) A reasonable fact-finder would be justified in

disregarding this evidence.  Second, even if the evidence was as Iannacone claims them it be, a reasonable fact-finder would not be obliged as a matter of law to conclude that, because individual representatives of the union were aware of the work performed by Electrical employees, JIB, a separate entity, was therefore unreasonable in relying on Iannacone's payroll reports to determine contribution and benefit amounts. JIB relies on the payroll reports to ascertain when and where members of Local 3 are employed and to make contribution and benefits calculations.  (Sessa Decl. ¶ 19.)  That is precisely what the payroll reports are for.  JIB is not obligated to ignore them simply because a union member may have observed Limited's sister company doing covered work with non-union workers.  Finally, even if JIB had suspected prior to November 2008, when it made its audit demand, that Iannacone was submitting false reports, it would still have had to rely on those reports – and suffer lost contributions – pending the results of any audit it might have conducted to determine the amount of contributions it believed Iannacone to be withholding.  In sum, the record contains sufficient evidence to support a finding that JIB reasonably relied on Iannacone's representations in making its contribution and benefits calculations.

        d.     *Injury to the Plaintiff*

Iannacone admits that no contributions were made to the ERISA plans in connection with the electrical work performed by Electrical's employees at 80 Metropolitan. Nonetheless, Iannacone argues that JIB suffered no damages as a result, even if the contributions were required by the CBA.  Iannacone cites Calicchio's testimony that Hudson Meridian "only wanted to deal with nonunion contractors" for the 80 Metropolitan project, (Calicchio Dep. at ¶ 37), and concludes that Hudson Meridian would not have hired Limited or any other union contractor to perform work on the project.  Thus, according to Iannacone, "there is no set of

circumstances under which JIB would have received or otherwise would have been entitled to the ERISA or other contributions JIB is now seeking in this action." (Pl.'s Mem. Support Summary Judgment at 18-19, Sept. 24, 2010, ECF. No. 42.)

Iannacone fails to account for the fact that the allegedly fraudulent acts took place after Electrical had been awarded the contract by Hudson Meridian. Finkel argues that Iannacone was aware that Electrical employees were performing covered work at 80 Metropolitan and "could have acknowledged that the work was covered and notified the JIB at any time after the project commenced," but failed to do so. (Def.'s Mem. Opp. Summary Judgment at 11-12, Oct. 15, 2010, ECF No. 44.) Had Iannacone not committed the allegedly fraudulent acts, and had he accounted in his payroll reports for the hours worked by Electrical employees performing electrical services, additional contributions would have been made to the ERISA plans. Accordingly, JIB has sufficiently alleged injury.

3.    *Iannacone's Argument that Allegedly Fraudulent Acts Were Breaches of Contract*

Iannacone notes that under New York common law, a plaintiff cannot prevail on a claim for fraud where its allegations relate only to a breach of contract. *See Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) ("[A]s a general matter, a fraud claim may not be used as a means of restating what is, in substance, a claim for breach of contract." (internal quotation marks omitted)). I need not determine whether Finkel could prevail on a claim of common law fraud on the facts and allegations before me. Finkel does not assert a claim of common law fraud; he asserts that Iannacone is liable under ERISA Sections 502 and 515. Liability for an alleged ERISA violation is a question of federal law. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56 (1987) ("The expectations that a federal common law of rights and obligations under ERISA-regulated plans would develop, indeed, the entire comparison of

ERISA's § 502(a) to § 301 of the LMRA would make little sense if the remedies available to ERISA participants and beneficiaries under § 502(a) could be supplemented or supplanted by varying state laws."); *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985) ("[Q]uestions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort.").

The inquiry developed by the Second Circuit for determining individual liability under ERISA borrows certain elements of a common law fraud claim, *see Lollo*, 35 F.3d at 33, but that does not equate a claim pursuant to ERISA Sections 502 and 515 with a claim for common law fraud. Iannacone has cited no case in which a federal court found these elements met, but declined to hold an individual defendant liable because the fraudulent actions constituted breaches of contract. In this context, such an approach would be untenable. The very purpose of ERISA is to "promote the interests of employees and their beneficiaries in employee benefit plans and *to protect contractually defined benefits*." *Leddy*, 875 F.2d at 388 (emphasis added). Courts in this circuit have therefore held individuals liable for corporate ERISA violations where "the corporate official lied directly to the [a beneficiary] about the number of hours worked by union employees in order to evade paying contributions under the collective bargaining agreement," *Lollo*, 35 F.3d at 34 (citing *Leddy*, 875 F.2d 383), and they have done so even after explicitly finding that the obligation to provide accurate reports was contractually mandated, *see, e.g. Perimeter*, 2009 WL 362640, at *1.

C.      *Rule 9(b) Pleading Requirements*

1.      *Legal Standard*

Under Fed. R. Civ. P. 9(b), a party "alleging fraud . . . must state with

particularity the circumstances constituting fraud . . . . Malice, intent, knowledge, and other

conditions of a person's mind may be alleged generally."  In order to satisfy the requirements of

Rule 9(b), a complaint must "(1) specify the statements that the plaintiff contends were

fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4)

explain why the statements were fraudulent."  *Anatian v. Coutts Bank (Switzerland) Ltd.*, 193

F.3d 85, 88 (2d Cir. 1999) (internal quotation marks omitted).  While mental conditions may be

pled generally, "plaintiffs must allege facts that give rise to a strong inference of fraudulent

intent," for instance either "(a) by alleging facts to show that defendants had both motive and

opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial

evidence of conscious misbehavior or recklessness."  *Acito v. IMCERA Group, Inc.*, 47 F.3d 47,

52 (2d Cir. 1995) (internal quotation marks omitted).  The purposes of Rule 9(b)'s particularity

requirements are "to provide a defendant with fair notice of a plaintiff's claim, to safeguard a

defendant's reputation from 'improvident charges of wrongdoing,' and to protect a defendant

against the institution of a strike suit."  *O'Brien v. National Property Analysts Partners*, 936 F.2d

674, 676 (2d Cir. 1991).

2.      *Finkel's Specific Allegations of Fraud*

Iannacone's argument that the amended complaint fails to satisfy Rule 9(b)'s

particularity requirement is meritless.  The amended complaint clearly identifies a specific

material misrepresentation or omission allegedly made by Iannacone.  It states that Iannacone

"avoided reporting the work [performed at 80 Metropolitan] to the Joint Board by failing to

submit the contractually-mandated 401(k) Plan Reports and Payroll Reports." (Am. Compl. ¶ 55; *see also id.* ¶ 64 ("... Iannacone, [sic] submitted, or caused to be submitted, Payroll Reports and 401(k) Plan Reports that deliberately underreported the amount of hours worked in covered employment and underpaid the amounts of Required Contributions owed.").)  The amended complaint identifies a particular time period during which these misrepresentations allegedly occurred (during a "two year plus" period beginning in September 2007, (*id.* ¶¶ 35, 55)), and the context in which they were made (on payroll reports and 401(k) plan reports submitted to JIB, (*id.* ¶ 64)).

Finally, the amended complaint alleges that Iannacone was "personally responsible for the daily operations of each of the Companies, is in charge of payroll for each of the Companies, and oversees and/or directs the payment or non-payment of Required Contributions to the Joint Board," (*id.* ¶ 52), that he "personally reviewed the relevant payroll for Electrical's employees performing work at the 80 Metropolitan Jobsite, (*id.* ¶ 53), that he "knew the electrical work performed by Electrical's employees at the 80 Metropolitan Jobsite was covered work according to the CBA's terms," (*id.* ¶ 54), and that he "knowingly . . . failed to notify the Joint Board of the circumstances [and] avoided reporting the work to the Joint Board, (*id.* ¶ 55).  These allegations give rise to a strong implication that Iannacone acted with both knowledge and fraudulent intent when he submitted allegedly false payroll reports to JIB.  There is no question that the allegations contained in Finkel's amended complaint were sufficient to place Iannacone on notice of the specific acts that constituted his alleged wrongdoing.

CONCLUSION

For the reasons stated above, Iannacone's motion for summary judgment is

denied.

So ordered.


John Gleeson, U.S.D.J.

Dated: October 29, 2010
       Brooklyn, New York